# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

**CHANTELLA R. ALLEN, on behalf of**
**S.N.A., a minor,**

    **Plaintiff,**

**v.**

**CAROLYN W. COLVIN, Acting**
**Commissioner of the Social Security**
**Administration,**

    **Defendant.**

)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No. CIV-15-1290-STE**

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration denying her child's application for Supplemental Security Income benefits (SSI) under § 1614(a)(3)(C) of the Social Security Act and 42 U.S.C. § 1382c(a)(3). The parties have consented to jurisdiction over this matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

The Commissioner has answered and filed a transcript of the administrative record (hereinafter TR. ____). The parties have briefed their positions, and the matter is now at issue. It is ordered that the Commissioner's decision be **REVERSED** and **REMANDED** for further administrative proceedings.

## I.    PROCEDURAL BACKGROUND

Plaintiff's application for benefits on behalf of her minor child S.N.A., was denied initially and on reconsideration. Following a hearing, an Administrative Law Judge (ALJ) issued an unfavorable decision. (TR. 14-25). On appeal, Plaintiff submitted additional evidence to the Appeals Council. (TR. 280-298). The Appeals Council considered the evidence[1] but denied Plaintiff's request for review. (TR. 1-4). Thus, the decision of the ALJ became the final decision of the Commissioner.

## II.    DETERMINATION OF DISABILITY FOR CHILDREN

The Social Security Act provides that "[a]n individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner applies a three-step sequential inquiry to determine whether an individual under the age of 18 is disabled. *See* 20 C.F.R. § 416.924(a). At step one, the ALJ determines whether the child is engaged in substantial gainful activity. *Id.* at § 416.924(b). If not, the inquiry continues to step two for

---

[1]  The Appeals Council did not consider records from Dr. Mark Mann dated July 28, 2014 and records from the Clinton Public Schools dated April 23, 2015, because the information was irrelevant to whether the child had been disabled prior to May 7, 2014, the date of the ALJ's decision. (TR. 2). *See Chambers v. Barnhart*, 389 F.3d 1139, 1142 (noting that the Appeals Council must only consider evidence that is related to the period on or before the date of the ALJ's decision).

consideration of whether the child has a severe medically determinable impairment(s). *Id.* at § 416.924(c). If so, step three involves determining whether such impairment meets, medically equals, or functionally equals a listed impairment. *Id.* at § 416.924(d). A child's impairment functionally equals an impairment if it is "of listing-level severity . . . *i.e.*, it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain . . . ." *Id.* at § 416.926a(a), (d). A child will be found "not disabled" if the impairment does not: (1) meet the twelve-month duration requirement or (2) meet, medically equal, or functionally equal a listed impairment. *Id.* at § 416.924(d)(2).

## III. THE ADMINISTRATIVE DECISION

The ALJ followed the three-step sequential evaluation process established for minor children as set forth in 20 C.F.R. §416.924(a). At step one, the ALJ found that S.N.A. had never engaged in substantial gainful activity. (TR. 17). At step two, the ALJ concluded that S.N.A. suffered from severe attention deficit hyperactivity disorder (ADHD). (TR. 17). At step three, the ALJ concluded that S.N.A. did not have an impairment that met or medically equaled a listed impairment. (TR. 18). Also, at step three the ALJ also evaluated the six domains to determine whether S.N.A.'s impairments functionally equaled a listed impairment. (TR. 18-25).

In doing so, the ALJ concluded that S.N.A. had a "less than marked" limitation in the domains of: (1) acquiring and using information, (2) attending and completing tasks, and (3) interacting and relating with others. (TR. 20-23). The ALJ also

concluded that S.N.A. had no limitation in the domains involving: (1) moving about and manipulating objects, (2) the ability to care for herself, and (3) health and physical well-being (TR. 23-25). Accordingly, the ALJ concluded that since S.N.A. did not have an impairment or combination of impairments resulting in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning, she was not disabled. (TR. 25).

## IV.    STANDARD OF REVIEW

This Court reviews the Commissioner's final decision "to determin[e] whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted).

In determining whether substantial evidence supports the Commissioner's decision, this Court will examine all of the evidence in the administrative record as well the evidence the Appeals Council considered in connection with the claimant's request for administrative review, regardless of whether review was ultimately denied. *See Chambers v. Barnhart,* 389 F.3d 1139, 1142 (10th Cir. 2004). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue,* 489 F.3d 1080, 1084 (10th Cir. 2007). A decision is not based on substantial evidence "if it is overwhelmed by other evidence in the record." *Wall v. Astrue,* 561 F.3d 1048, 1052 (10th Cir. 2009) (quotation omitted).

## V.    ISSUE PRESENTED

Ms. Allen argues that a portion of the evidence submitted to the Appeals Council directly rebuts the ALJ's findings at step three regarding whether Plaintiff's ADHD had functionally equaled a listed impairment. As a result, Plaintiff contends that the ALJ's step three findings lack substantial evidence.

## VI.    THE STEP THREE FINDINGS LACK SUBSTANTIAL EVIDENCE

The overwhelming evidence establishes that S.N.A.'s ADHD was functionally equal to a listed impairment. Accordingly, the Court concludes that the ALJ's contrary findings lack substantial evidence.

### A.    Evaluating "Functional Equivalence"

A child's impairment functionally equals a listed impairment if it is "of listing-level severity . . . *i.e.*, it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain . . . ." *Id.* at § 416.926a(a), (d). The six domains are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. *Id.* at § 416.926a(b)(1).

A "marked" limitation will be found if an impairment "seriously" interferes with the child's "ability to independently initiate, sustain, or complete activities." *Id.* at § 416.926a(e)(2). A marked limitation may also be found if the child has a valid score that is more than two, but less than three, standard deviations below the mean, on a

comprehensive standardized test designed to measure a particular domain, although the Commissioner will not rely solely on the test results. *Id.* at §§ 416.924a(a)(1)(ii), 416.926a(e)(2). If the interference is "very serious[]", the limitation is considered "extreme." *Id.* at 416.926a(e)(3).

In assessing whether a child has "marked" or "extreme" limitations, the ALJ considers the functional limitations from all medically determinable impairments, including any impairments that are not severe. *Id.* at § 416.926a(a). The ALJ must consider the interactive and cumulative effects of the child's impairment or multiple impairments in any affected domain. *Id.* at § 416.926a(c). The ALJ is required to compare how appropriately, effectively, and independently the child performs activities compared to the performance of children of the same age who do not have impairments. *Id.* at § 416.924a(b).

### B.    Evidence Submitted to the Appeals Council

In the instant case, the ALJ concluded that S.N.A. suffered from "less than marked" limitations in the areas of: (1) acquiring and using information, (2) attending and completing tasks, and (3) interacting and relating with others. (TR. 20-23).[2] Ms. Allen contends that the ALJ's findings lack substantial evidence in light of two pieces of evidence submitted to the Appeals Council: (1) a questionnaire completed by S.N.A.'s second grade teacher, Marilou Schantz and (2) an

---

[2]  Ms. Allen is not challenging the domains involving: (1) moving about and manipulating objects, (2) caring for yourself, and (3) health and physical well-being. *See* ECF No. 19:8, n.2.

individualized education plan (IEP) for S.N.A. completed by school representatives. (TR. 280-94).[3] According to Plaintiff, this evidence establishes that S.N.A. suffered from "marked" limitations in at least two of the domains, and an "extreme" limitation in one domain—findings which would establish that S.N.A.'s ADHD had functionally equaled a listed impairment. (ECF No. 19:2-11).

The Appeals Council considered the additional evidence but concluded that it did "not provide a basis for changing the Administrative Law Judge's decision." (TR. 2). This language indicates that the Appeals Council had "adequately considered" the teacher questionnaire and the IEP. *Martinez v. Barnhart*, 444 F.3d 1201, 1207 (10th Cir. 2006). As a result, the Court will examine the additional evidence, along with the entire administrative record, to evaluate whether the ALJ's decision was supported by substantial evidence. *Id.*

## 1. The Teacher Questionnaire Completed by Marilou Schantz

On April 11, 2014, Plaintiff's second grade teacher, Marilou Schantz, completed a questionnaire regarding S.N.A.'s limitations in each of the six functional domains. (TR. 280-287). In the area of acquiring and using information, Ms. Schantz

---

[3]    In her opening brief, Plaintiff also references a piece of correspondence from her representative to the Social Security Administration which was submitted to the Appeals Council as "germane" to the federal appeal. (ECF No. 19:3). The evidence is a short letter which states: "I am requesting an explanation. I was told by the ALJ assistant that I would have a chance to submit the IEP before a decision was made. She gave me until 5/15/2014. The decision was posted last week? If you have any questions please let me know." (TR. 295). Aside from the reference to the letter being "germane," Plaintiff does not provide any substantive argument regarding how this letter would have affected the ALJ's findings at step three.

stated that S.N.A. had a "very serious" daily problem with expressing ideas in written form and "serious" daily problems in comprehending and doing math problems and providing organized oral explanations and adequate descriptions. (TR. 281). In the domain of attending and completing tasks, Ms. Schantz stated that S.N.A. had "very serious" hourly problems in the areas of:

- Focusing long enough to finish assigned activity or task,

- Refocusing to task when necessary,

- Changing from one activity to another without being disruptive,

- Completing class/homework assignments,

- Completing work accurately without careless mistakes,

- Working without distracting self or others, and

- Working at a reasonable pace/finishing on time.

(TR. 282). S.N.A. also had daily "very serious" problems with waiting to take turns and hourly "serious" problems with paying attention when spoken to directly. (TR. 282). Finally, in the area of interacting and relating to others, Ms. Schantz reported that S.N.A. suffered daily "serious" problems using adequate vocabulary and grammar to express thoughts/ideas in general everyday conversation. (TR. 283).

## 2. The Individualized Education Plan

On May 6, 2014, school officials met to discuss the parameters of a continued individualized special education plan for S.N.A. as she concluded her second year in school and continued to third grade. (TR. 288-294). In the IEP, S.N.A.'s special

education teacher noted that S.N.A. suffered from ADHD and continued to struggle in the regular classroom. (TR. 288). At that time, test scores showed that S.N.A. ranked in the first percentile in Reading and could read at the grade equivalent of an average student in the first grade, fifth month. (TR. 288). In Math, S.N.A.'s achievement was equated to that of an average student in the first grade, fourth month, with a ranking in the twenty-seventh percentile. (TR. 288). Due to her difficulties in Reading and Math, the plan provided extra services where S.N.A would be pulled outside the regular classroom for individualized help in these classes four times per week. (TR. 290). Although S.N.A. qualified for "regular" state-wide cumulative testing at the end of the year, she would be tested in a small group with frequent breaks due to her ADHD. (TR. 291).

As discussed, the social security regulations state that "serious" impairments equate to a finding of "marked" limitations in a particular domain and "very serious" impairments equate to a finding of "extreme" limitations. 20 C.F.R. § 416.926a(e)(2)-(3). Ms. Schantz had opined that S.N.A. had: (1) "marked" limitations in the areas of acquiring and using information and interacting and relating to others and (2) "extreme" limitations in the area of attending and completing tasks. And the test results as set forth in the IEP which indicate S.N.A.'s cognitive aptitude as more than one grade level below her peers indicate limitations in the area of acquiring and using information. *See* Social Security Ruling 09-3p, Title XVI: Determining Childhood Disability—The Functional Equivalence Domain of "Acquiring and Using Information,"

2009 WL 396025, at *6 (Feb. 17, 2009) (noting that an example of limitations in this area is the child's inability to read or do arithmetic at the appropriate grade level).

Under the regulations, the teacher questionnaire and IEP strongly indicate that S.N.A. suffered from "marked" limitations in two domains and "extreme" limitations in one domain—findings which would support a conclusion of functional equivalence at step three. However, The ALJ was not privy to this evidence as it was only submitted to the Appeals Council. Therefore, this Court must examine the additional evidence in light of the entire record and the reasons proffered by the ALJ in concluding otherwise, to determine if the ALJ's decision was supported by substantial evidence.

### C.     The Domain of Acquiring and Using Information

The domain of acquiring and using information encompasses a child's ability to learn information and to think about and use that information. SSR 09-3p, at *2. In assessing limitations in this domain, adjudicators may examine assessments of cognitive ability measured by intelligence tests, academic achievement instruments, grades in school, and special education or other services. *Id.* at *3. A "marked" limitation is indicated if the child has a valid score that is more than two, but less than three, standard deviations below the mean, on a comprehensive standardized test designed to measure a particular domain. *See* 20 C.F.R. §§ 416.924a(a)(1)(ii), 416.926a(e)(2). Some examples of limitations in this domain include:

- Not performing Reading or Math at the appropriate grade level,

- Difficulty comprehending written or oral directions, and

- A struggle with following simple instructions.

## 1. The ALJ's Findings

In the instant case, the ALJ found that S.N.A. had "less than marked" limitations in this domain, providing the following rationale:

> As previously stated, there is not objective evidence that the claimant has low IQ scores or any other cognitive disorder. She is achieving below
> grade level in most academic areas due to her problems with inattention in the classroom. She continues to make academic progress despite this,
>
> and she is on an IEP plan and receives help from teachers after school. When her medications are working, she reportedly does fine.

(TR. 21).

In concluding that S.N.A. had "less than marked" limitations in the area of acquiring and using information, the ALJ gave "great weight" to the opinions of non-examining State Agency physicians, noting that the opinions "are generally consistent with the medical records and other evidence in the file." (TR. 20). The ALJ gives no other details regarding the State Agency opinions, and indeed, the record reveals that the opinions are sparse.

On March 8, 2012, State Agency psychologist, Dr. Ron Cummings, reviewed S.N.A.'s records and found that she had "less than marked" limitations in the domains involving acquiring and using information and attending and completing

tasks and that S.N.A had no limitations in the domain involving "interacting and relating with others." (TR. 381). In April 2012, two additional State Agency psychologists affirmed Dr. Cummings' findings. (TR. 406-411).[4] Other than his general reference to giving the State Agency psychologists' opinions "great weight," the ALJ does not give specific examples in support of his reasoning or cite to particular findings. And in fact the record provides contrary evidence.

### 2. Evidence Which Weighs Against the ALJ's Findings

On April 16, 2012, School Psychometrist, Sandra Schimmer, performed a variety of cognitive and developmental tests on S.N.A. to assess her overall intellectual ability, specific cognitive abilities, and academic achievement. (TR. 395-405). S.N.A.'s overall intellectual function ranked at the fifth percentile with a standard score of 76, which fell in the "low range" of ability for her age. (TR. 395-96, 399). Additionally, compared to her peers, S.N.A. scored in the "low range" in the areas of visual-auditory learning and comprehension knowledge. (TR. 399). S.N.A. ranked in the "very low range" when compared to her peers, in the areas of verbal comprehension, numbers reversed, and short term memory. (TR. 399).

---

[4] The record contained two additional opinions from non-examining State Agency physicians. On March 24, 2011, State Agency psychologist Cynthia Kampschaefer found "no severe limitations" although according to a teacher questionnaire, S.N.A. had difficulty knowing procedures, staying on task, and sitting in her chair. (TR. 310). On May 10, 2011, a second State Agency psychologist affirmed Dr. Kampschaefer's findings. (TR. 316). The ALJ generally cited the "opinions of the State agency medical consultants" to which he accorded "great weight," but without further explanation, the undersigned assumes that the ALJ did not adopt these findings as they conflict with the ALJ's findings at step two that S.N.A. suffered from a severe impairment involving ADHD. *See* TR. 17.

In areas of specific instruction, S.N.A. exhibited scores which were more than two, but less than three, standard deviations below the mean in the areas of: (1) verbal comprehension, (2) numbers reversed, and (3) brief Math. (TR. 404-405). This evidence would be indicative of a "marked" limitation in these areas and in the specific domain of acquiring and using information. *See* 20 C.F.R. §§ 416.924a(a)(1)(ii), 416.926a(e)(2) (a marked limitation may also be found if the child has a valid score that is more than two, but less than three standard deviations below the mean, on a comprehensive standardized test designed to measure a particular domain). In sum, Ms. Schimmer stated:

> Overall, [S.N.A.'s] academic skills are very limited. . . . [and her] overall intellectual ability is in the low range of standard scores. . . . [S.N.A.] will probably gain the most from reading instruction presented with the middle to late first grade range. . . . Math instruction presented within the middle to late kindergarten range will likely produce the greatest gains for [S.N.A.]. . . . Accommodations may be useful in compensating for [S.N.A.'s] limitations in short-term memory. Some examples include keeping oral directions short and simple, asking Savannah to paraphrase directions to ensure understanding, and providing visual cues for directions or steps to be followed.

(TR. 398-402). The psychometrist referred S.N.A. for an evaluation of a suspected learning disability. (TR. 399).

In addition to his statement that the record lacked cognitive testing, the ALJ also noted that S.N.A. "continues to make academic progress" despite her struggles in school. (TR. 20). But the record shows a steady decline in her academic gains as she progressed through school. *See* TR. 177 (in kindergarten, S.N.A. was at kindergarten level in Math and Reading); TR. 239, 253, 288 (in first grade, S.N.A.

was below grade level in Math and Reading); TR. 280 (in second grade, S.N.A. was below grade level in Reading). The ALJ also stated that S.N.A. "is on an IEP plan and receives help from teachers after school." (TR. 21). But S.N.A.'s IEP shows that she is pulled out of the regular classroom for small-group services in Reading and Math four times a week, not that she stays after school for extra help. (TR. 290). Finally, the ALJ noted that "when [S.N.A.'s] medications are working, she reportedly does fine." (TR. 21). This statement diminishes the reality of S.N.A.'s lengthy and turbulent history taking ADHD medication.

Between January 2010 and January 2011, treating physician Dr. Chris Kolker prescribed Ritalin, and then added Adderall, to treat S.N.A.'s ADHD. (TR. 360, 362, 364, 366, 367-368, 374-375). During this time, with increases in the medication in July and November 2010, the record indicates that S.N.A. was doing well at school with good behavior and no problems. (TR. 360, 362, 364, 366, 367-368). However, in March of 2011, Dr. Kolker noted that S.N.A. threatened someone and was aggressive. (TR. 357). As a result, Dr. Kolker increased the Adderall, noting that the medicine would help, but "there [would] not be a cure." (TR. 357). In July 2011, Dr. Kolker again increased Plaintiff's Adderall and noted that S.N.A. "was hyper, very difficult to control very aggressive, not violent but more aggressive with speech." (TR. 354). Dr. Kolker noted that S.N.A. and her mother were "not trying to do any homework to return to school." (TR. 354). Two weeks later, Dr. Kolker noted that the increased medication was "simply not effective" and was "without results." (TR. 351).

As a result, Dr. Kolker changed S.N.A.'s medication to Strattera, 25 mg once daily. (TR. 351-352).

On August 30, 2011, Dr. Kolker noted that the Strattera was not working, so he switched S.N.A.'s medication back to Adderall. (Tr. 349-350). According to Dr. Kolker's notes, S.N.A. was "doing terrible in school and not sitting still." (TR. 349). On October 24, 2011, Dr. Kolker noted that the Adderall was not helping, so the physician switched S.N.A.'s medication back to Strattera, 40 mg, once daily. (TR. 342-343). On November 7, 2011, Dr. Kolker increased the Strattera to 60 mg, once daily, and added Guanfacine, one half pill, three times a day. (TR. 338-340).

On November 16, 2011, Dr. Kolker noted that the medication regime seemed to be working and that S.N.A. had "settled down quite a lot." (TR. 336). In December 2011, Dr. Kolker noted that S.N.A's grades were good at school but that she still had "difficulty concentrating [and] . . . . staying in focus at school." (TR. 333). In January 2012, Dr. Kolker discontinued Strattera and added Adderall to address S.N.A.'s continued hyperactivity. (TR. 322-323). From March to August 2012, Dr. Kolker continued prescribing Adderall and Guanfacine which the physician noted had "normalized behavior." (TR. 415-426). However, in August of 2012, Dr. Kolker increased the Adderall to 50 mg, twice daily. (TR. 414).

### 3. Summary

The ALJ's statement regarding a lack of evidence concerning cognitive deficits is contradicted by findings from School Psychometrist, Ms. Schimmer. Cognitive test

results indicate that S.N.A. suffers from a "marked" limitation in this domain, which is further supported by findings from the teacher questionnaire from Ms. Schantz, as well as S.N.A.'s IEP. Although ADHD medication helped control S.N.A.'s behavior for approximately one year, findings from Dr. Kolker indicate that the child continued to struggle throughout 2011 and most of 2012. The sum of this evidence outweighs the contrary opinions of the non-examining State Agency physicians and the ALJ's findings regarding this domain. As a result, the undersigned concludes that substantial evidence does not support the ALJ's findings that S.N.A. had "less than marked" limitations in the domain of acquiring and using information.

### D.    The Domain of Attending and Completing Tasks

The domain of attending and completing tasks encompasses a child's ability to "initiate and maintain attention, including the child's alertness and ability to focus on an activity or task despite distraction, and to perform tasks at an appropriate pace." Social Security Ruling 09-4p, Title XVI: Determining Childhood Disability—The Functional Equivalence Domain of "Attending and Completing Tasks," at *2 (Feb. 18, 2009). In assessing limitations in this domain, adjudicators will consider the child's ability to change focus after completing a task, to avoid impulsive thinking and acting, organize things, and manage time. *Id.* at * 2. One assessment of limitations in this domain is whether school age children focus long enough to do classwork and homework. *Id.* at *2. As noted by the Social Security Administration, children with ADHD may be particularly susceptible to limitations in this domain. The SSA states:

Children with attention-deficit hyperactivity disorder (AD/HD) whose primary difficulty is inattention may be easily distracted or have difficulty focusing on what is important and staying on task. They may fail to pay close attention to details and make careless mistakes in schoolwork, avoid projects that require sustained attention, or lose things needed for school or other activities beyond what is expected of children their age who do not have impairments. Children with AD/HD whose primary difficulty is hyperactivity and impulsivity may fidget with objects instead of paying attention, talk instead of listening to instructions, or get up from their desks and wander around the classroom beyond what is expected of children their age who do not have impairments.

*Id.* at *3. Some examples of limitations in this domain include:

- Is slow to focus on or fails to complete activities that interest the child,

- Gives up easily on tasks that are within the child's capabilities,

- Repeatedly becomes sidetracked from activities or frequently interrupts others,

- Needs extra supervision to stay on task, and

- Cannot plan, manage time, or organize self in order to complete assignments or chores.

*Id.* at *5-6.

### 1. The ALJ's Findings

Here, the ALJ found that S.N.A. had "less than marked" limitations in this domain, providing the following rationale:

As noted, the claimant has periodic difficulties with paying attention and staying on task. She is described as "very active." The treating and medical notes report the claimant does well on medications, then periodically reports increased difficulties in the area, at which time her medications are adjusted. After each medication adjustment, she returns to her overall stability and improved baseline. She does not need instructions repeated to her. One of her teachers states,

> "Savannah's behavior is fine if she is on task. If she does not understand, she will shut down and not listen to any directions." This implies that there are times that the claimant is able to focus on and complete work.

(TR. 22). The ALJ does not provide supporting citations in his explanation, and the record provides contrary evidence.

## 2. Evidence Which Weighs Against the ALJ's Findings

First, the ALJ's statement was only partially accurate regarding S.N.A.'s attention and focus being stabilized following medication adjustments. During 2011, S.N.A. seemed to do well in school following three medication adjustments. *See* TR. 360, 362, 364, 366. However in 2011, Dr. Kolker increased Plaintiff's medication twice due to increased aggression and hyperactivity. (TR. 354, 357). Two weeks following the adjustment in July 2011, Dr. Kolker noted that the increased medication was "simply not effective" and was "without results." (TR. 351). As a result, Dr. Kolker changed S.N.A.'s medication to Strattera but after a month with no results, the physician switched S.N.A.'s medication back to Adderall. (TR. 349-350). According to Dr. Kolker's notes, S.N.A. was "doing terrible in school and not sitting still." (TR. 349).

On September 30, 2011, Dr. Kolker noted that S.N.A. was "doing well," but over the next three months the physician changed S.N.A.'s medication three times. (TR. 336 338-340, 342-343, 346). In December 2011, Dr. Kolker noted that S.N.A's grades were good but that she still had "difficulty concentrating [and] . . . . staying

in focus at school. (TR. 333). In January 2012, Dr. Kolker discontinued Strattera and added Adderall to address S.N.A.'s continued hyperactivity. (TR. 322-323).

School records during 2011 and 2012 support the physician's findings of continued hyperactivity and inattention during this time. For example, on a teacher questionnaire in March 2011, school officials noted that S.N.A. had "very serious problems" hourly with her ability to change from one activity to another without being disruptive, and had "serious" hourly problems in her ability to: (1) focus long enough to finish assigned activity or task, (2) wait to take turns, and (3) organize her things or school materials. (TR. 179). A teacher noted that S.N.A. had trouble staying on task, sitting in her chair and was in "constant movement." (TR. 179). And in the same record the ALJ cited as evidence of "times that the claimant is able to focus on and complete work," S.N.A.'s teacher noted that she was "having difficulty staying focused [which] affect[ed] her learning in the classroom." (TR. 192).

In 2012, S.N.A.'s teacher noted that she had: (1) "very serious" hourly problems in the area of changing from one activity to another without being disruptive, (2) "serious" hourly problems in her ability to work without distracting others, and (3) daily "serious" problems in her ability to carry out multi-step instructions, organize her things or school materials, and complete work accurately without careless mistakes. (TR. 255).

Additional evidence exists regarding limitations in this domain. On December 22, 2011, Dr. Kolker completed a "Child's Mental Impairment Medical Source

Statement" and opined that S.N.A. suffered from ADHD characterized by psychomotor agitation which resulted in her ability to stay still for only a few seconds. (TR. 318). Dr. Kolker also noted that S.N.A.'s problems existed despite the fact that she was taking two ADHD medications, one of which caused agitation. (TR. 318). Dr. Kolker opined that S.N.A. had "marked" limitations in the area of attending and completing tasks. (TR. 319).

In April of 2014, treating physician Dr. Mark Mann completed a similar questionnaire, noting that S.N.A. suffered from emotional lability, difficulty thinking and concentrating and irritability. (TR. 437-38). Dr. Mann also noted that S.N.A.'s mother had reported that the ADHD medications were "of marginal benefit." (TR. 438). Dr. Mann concluded that S.N.A. had "marked" limitations in the domain of attending and completing tasks. (TR. 439).

### 3. Summary

In sum, the undersigned concludes that substantial evidence does not support the ALJ's findings that S.N.A. had "less than marked" limitations in the area of acquiring and using information. The ALJ relied on findings that ADHD medication stabilized S.N.A.'s hyperactivity and inattentiveness, but that rationale is overwhelmed by contrary medical evidence and statements from school officials and medical professionals which concluded otherwise. Evidence from Dr. Kolker and Dr. Mann indicate that S.N.A. suffers from "marked" limitations in this domain. Evidence from two of Plaintiff's teachers states that she suffers from hourly "very serious

20

problems" in a variety of areas in this domain, which would indicate an "extreme" limitation in this domain. The sum of this evidence clearly outweighs: (1) the contrary opinions of the non-examining State Agency physicians and (2) the ALJ's ultimate conclusion with regards to this domain.

### E.    The Domain of Interacting and Relating With Others

The domain of interacting and relating with others encompasses a child's ability to "initiate and respond to exchanges with other people, and to form and sustain relationships with family members, friends, and others." Social Security Ruling 09-5p, Title XVI: Determining Childhood Disability—The Functional Equivalence Domain of "Interacting and Relating With Others," 74 FR 7515-01 at *7516. (Feb. 17, 2009). Some examples of limitations in this area for school age children ages 6-12 include:

- Having no close friends or having friends that are older or younger,

- Avoiding or withdrawing from people he or she knows,

- Is overly anxious or fearful of meeting new people,

- Has difficulty cooperating and communicating with others.

*Id.* at *7518.

### 1.   The ALJ's Findings

The ALJ found that S.N.A. had "less than marked" limitations in this domain, providing the following rationale:

> There have been some problems with aggression reported in the past, but none recently. No examiner or physician has noted any difficulties

> in getting along with the claimant, and teachers indicate that it is the claimant's hyperactivity that results [in] any social interaction problems she may have; no isolation or inability to play with others has been reported. The Administrative Law Judge notes that having some difficulties in getting along with siblings and peers is age appropriate. The treating records state that the claimant's problem is hyperactivity without accompanying violent behavior, aggression, or destructiveness. Dr. Kolker described the claimant as very well liked and very fun to be around.

(TR. 23). Ms. Allen relies on evidence from a teacher questionnaire submitted to the Appeals Council to support her claim that S.N.A. suffers from "marked" limitations in this area. A review of that questionnaire shows that S.N.A.'s teacher reported that the child suffered from daily "serious" problems in one area under this domain—the ability to use adequate vocabulary and grammar to express her thoughts and ideas in general everyday conversation. (TR. 283). But weighing the balance of the evidence, the Court concludes that the ALJ's findings are supported by substantial evidence.

### 2. Evidence Regarding Ability to Interact and Relate with Others

In November 2010, Dr. Kolker noted that S.N.A. was "still not violent [or] . . . getting into fights." (TR. 364). And in January and February 2011, Dr. Kolker continued the Adderall and noted that S.N.A.'s "behavior was excellent" and that "school was going well." (TR. 360, 362). In December 2011, Dr. Kolker opined that that S.N.A. had "less than marked" limitations in the area of interacting and relating with others. (TR. 319).

22

In January 2012, Ms. Allen reported that her daughter had friends her own age, generally got along with adults and teachers, but did not make friends easily. (TR. 201). At that same time, S.N.A.'s teacher reported that the child had "slight" and "obvious" problems in this domain, but that she did not have any "serious" or "very serious" problems. (TR. 242). Two months later, however, the same teacher noted that S.N.A. had hourly serious problems in her ability to use adequate vocabulary to express herself, and that she had daily "serious" problems in seeking attention appropriately, expressing anger appropriately, introducing and maintaining relevant and appropriate topics of conversation. (TR. 256). In April of 2014, treating physician Dr. Mark Mann concluded that S.N.A. had "less than marked" limitations in this domain. (TR. 439).

### 3. Summary

In sum, two teacher questionnaires would indicate that S.N.A. suffered from "marked" limitations in the domain of interacting and relating with others. However, two medical professionals rendered contrary findings and the child's mother provided information which indicated a lack of impairment in this domain. On the whole, the undersigned concludes that substantial evidence supports the ALJ's findings regarding "less than marked" limitations in this domain.

### F.     Conclusion

As discussed, a lack of substantial evidence exists to support the ALJ's findings that S.N.A. suffered from "less than marked" limitations in the functional domains of

acquiring and using information and attending and completing tasks. In those areas, the majority of the evidence indicates that S.N.A. suffers from at least "marked" limitations in both domains and perhaps even an "extreme" limitation in the domain involving attending and completing tasks. The Court understands that the ALJ did not have the benefit of very pertinent information which could have resulted in a different outcome. With the remand, the ALJ will have the opportunity to assess the entire record, including the evidence submitted to the Appeals Council, and make new findings at step three.

## VII.  ORDER

Having reviewed the medical evidence of record, the transcript of the administrative hearing, the decision of the ALJ, and the pleadings and briefs of the parties, the undersigned magistrate judge **REVERSES** the Commissioner's decision and **REMANDS** the matter for further administrative proceedings.

ENTERED on September 16, 2016.


_____
SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE